# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MAKENA PAYNE-HOPPE,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-0097
Beckwith, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and Supplemental Security Income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 9), the Commissioner's response in

opposition (Doc. 10), and plaintiff's reply memorandum. (Doc. 11).

## I. Procedural Background

Plaintiff filed applications for DIB and SSI in April 2007, alleging disability since

February 14, 2000,[1] due to severe aplastic anemia, asthma, and paroxysmal nocturnal

hemoglobinuria (PNH)[2]. Plaintiff's applications were denied initially and upon reconsideration.

Plaintiff, through counsel, requested and was granted a de novo hearing before ALJ Deborah

Smith. Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing. On

December 23, 2009, the ALJ issued a decision denying plaintiff's DIB and SSI applications.

---

[1] In her statement of errors, plaintiff amends her disability onset date to March 12, 2007, the date that her symptoms flared and she required hospitalization. (Doc. 9 at 2, citing Tr. 237).

[2] Paroxysmal nocturnal hemoglobinuria (PNH) is a descriptive term for the clinical manifestation of red blood cell breakdown with release of hemoglobin into the urine that is manifested most prominently by dark-colored urine in the morning. http://emedicine.medscape.com/article/207468-overview (last accessed 1/20/12).

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Medical Evidence

### 1. Treatment records

Plaintiff was treated at the Cincinnati Children's Hospital Hematology Department for aplastic anemia for several years beginning in November 2001. (Tr. 370-71). In January 2006, plaintiff became a new patient at the New Richmond Family Practice, while continuing to treat with Dr. Richard Harris, M.D., at Children's Hospital Hematology Department for her aplastic anemia. (Tr. 216-18). Treatment notes from the practice dated January 10, 2006, state that plaintiff was evidently stable from a blood count perspective. (*Id.*). Plaintiff denied problems with fatigue, shortness of breath, or signs or symptoms of anemia. (*Id.*).

On March 14, 2007, plaintiff presented at the Children's Hospital emergency room where she was diagnosed with PNH and venous thrombosis.[3] (Tr. 284). It was noted that she had been admitted and treated for aplastic anemia in 2007 and had been well since that time. She was discharged six days later in good condition. (Tr. 287). Her discharge medications included Warfarin, an anticoagulant. (Tr. 286).

In March 2007, on a follow-up visit for venous thrombosis, Dr. Harris reported that plaintiff had developed PNH as a complication of the treatment of her aplastic anemia several

---

[3]Plaintiff had been seen at the emergency room at Mercy Hospital two days earlier and was found to be anemic. (Tr. 237). The history from that emergency room visit states that plaintiff had not seen a physician for five years, which plaintiff said was secondary to her loss of insurance. (*Id.*). However, the report also notes: "It has only bee[n] six months since the patient has seen her hematologist" and that plaintiff "had labs a year ago where she was not anemic." (Tr. 237-38). The record shows that plaintiff was being treated on a regular basis at the Children's Hospital hematology clinic preceding the emergency room visit. (*See* Tr. 252- 4/20/06 emergency room report stating emergency room doctor contacted Dr. Harris because plaintiff was seeing him as an outpatient).

2

years earlier. (Tr. 297). He reported that plaintiff had experienced no particular problems since she had last been seen but that she continued with "a general feeling of malaise typical of patients who have PNH with active hemolysis." (*Id.*).

Plaintiff began receiving Soliris infusions for treatment of PNH in April 2007 under the care of Dr. Harris. (Tr. 296). The plan was to give her four weekly doses and then doses every other week. (*Id.*). In April of 2007, plaintiff complained of continuing to feel fairly fatigued. (*Id.*). In May of 2007, she received her first biweekly Soliris dose. (Tr. 291). When she received her next dose later that month, plaintiff complained of a severe backache which made it difficult for her to find a comfortable position in bed and to stand for an extended length of time at her job, and she was referred to orthopedics. (Tr. 289). The record shows that Dr. Harris saw plaintiff in the Children's Hospital hematology clinic until June of 2007. (Tr. 289).

Dr. Harris wrote a letter to Jobs and Family Services dated June 17, 2007. (Tr. 402-03). In the letter he stated that he had followed plaintiff for several years at the Children's Hospital's Bone Marrow Failure Clinic. He reported that plaintiff has PNH, which he described as a "hemolytic anemia condition with exacerbations generally whenever she becomes infected with a virus," during which her urine turns red and hemolysis (destruction) of her red blood cells occurs. (Tr. 402). He also reported that patients with PNH have a high risk of developing thrombosis (blood clots in the venous and arterial vessels), and he stated that plaintiff had developed a blood clot in her right arm for which she required hospitalization and placement on anticoagulation with Coumadin. Dr. Harris reported that plaintiff was being treated every two weeks with Soliris, which made it possible to stop the ongoing hemolysis and reduce the risk of developing new thromboses. He noted that plaintiff remained on Coumadin and would probably have to stay

3

on the medication for the rest of her life.

Dr. Harris reported that the ongoing hemolysis with the resultant anemia and need for anticoagulation, with increased risk of bruising and bleeding, limits plaintiff's ability to work. Dr. Harris noted that although he believed plaintiff had a job working at a restaurant, she had to miss many days of work due to her medical treatment or symptoms related to the disease itself.

Dr. Harris concluded that because of her anticoagulation and her anemia, he would suggest that plaintiff not work at any job that requires her to stand for long periods of time or which may involve continued physical exertion or contact with any machinery which might cause bruising, bleeding, or physical injury. (Tr. 403).

On June 12, 2007, Dr. Joseph Palumbo, M.D., of the Children's Hospital hematology clinic reported in a treatment note that plaintiff had been doing well on Soliris infusions until she was recently weaned to treatment every 14 days, at which time she developed more signs and symptoms of hemolysis. (Tr. 288). Plaintiff reported that she was "significantly symptomatic because of her anemia" and was having difficulty climbing more than one or two flights of stairs and attending work because of tiredness and shortness of breath. On physical examination, she was tired but otherwise appeared well and nontoxic. She required a red cell transfusion on that date. Two days later, Dr. Harris changed plaintiff's dosage of Soliris to every 12 days. (Tr. 501). Treatment notes from the following dates reflect that plaintiff's condition thereafter improved and her energy level increased:

- July 2007- Dr. Palumbo reported that since her last visit, plaintiff had been doing very well on a regimen of Soliris every 12 days under Dr. Harris' supervision and she had experienced no recent decrease in her energy levels, although she was more tired than she had been before her diagnosis. (Tr. 496-97).

- August 2007- Dr. Palumbo reported plaintiff's energy level had been good. (Tr. 494).

4

- September 2007- Dr. Palumbo reported her energy level had been "reasonable." (Tr. 487).

- Oct. 2007- Dr. Palumbo reported she was doing well, her energy level had been good, she denied any symptoms related to anemia or hemolysis, she was well appearing, and she continued to do well off Soliris. (Tr. 483-84).

- Oct. 2007- Dr. Harris reported she had some increase in fatigue since Soliris was stopped for a trial period in mid-September, but this had not been a major problem over the last couple of weeks. (Tr. 481-82).

- Nov. 2007- Dr. Harris reported that plaintiff "remains active, going to school and working." (Tr. 479-80).

- Dec. 2007- Dr. Palumbo reported that plaintiff had no symptoms related to her condition and her energy level was good. (Tr. 477-78).

Plaintiff's Soliris infusions resumed at some point after being discontinued for a trial period during the fall of 2007. (*See* Tr. 483-84). In February of 2008, Dr. Palumbo reported that plaintiff had been doing well over the last two weeks since the last Soliris injection and that she continued to tolerate the medication without any problems. (Tr. 504). Plaintiff denied symptoms of hemolysis or anemia and overall she was feeling well. Dr. Palumbo noted her primary care physician had started her on pain medications for chronic low back pain secondary to disc degeneration which included Percocet, Flexeril and a long-acting NSAID. Her review of systems was negative. She was reported to be doing "very well." (Tr. 504-05). Treatment notes reflect that plaintiff continued to do well on biweekly Soliris injections during 2008 and 2009 with no significant physical concerns:

- March 2008- Plaintiff had been doing well. (Tr. 710, 713).

- April 2008- Plaintiff was doing well. (Tr. 716).

- May 2008- Plaintiff was doing well overall. (Tr. 734).

5

- June 2008- Plaintiff was feeling well overall but back pain was worsening. (Tr. 784).

- September 2008- Plaintiff was doing very well, energy level had been good, and she denied any significant symptoms of hemolysis, including fatigue. (Tr. 925, 950).

- October/November 2008- Plaintiff had been well and had no specific complaints or concerns. (Tr. 970, 973).

- January 2009- Plaintiff reported she had been feeling well with a good energy level. She was encouraged to volunteer to increase her well-being, and she indicated interest in volunteering at the zoo. (Tr. 997, 1007).

- February 2009- Plaintiff was doing well, her energy level was normal, and she had no complaints or concerns. (Tr. 682).

- May 2009- Plaintiff was doing well and had no symptoms of hemolysis or thrombosis. (Tr. 663).

On September 16, 2009, plaintiff was admitted to the hospital for four days with right sided cervical lymphadenitis with associated pain and swelling. (Tr. 536-67). She was discharged with clinical improvement to follow up with Dr. Palumbo in hematology. (Tr. 537). The mass was drained during a seven-day hospital stay. (Tr. 568-610).

An MRI performed during plaintiff's hospitalization showed degenerative disk disease at the L4/L5 and L4/S1 intervertebral disk level with increased disk space narrowing; focal central protrusion at L4/L5, decreased since a prior study, with focal T2 signal consistent with annular tear; and right posterior paracentral protrusion of the L5/S1 disk mildly narrowing the right lateral recess and abutting the exiting right L5 nerve root, slightly increased in size, and focal T2 signal consistent with annular tear. (Tr. 554).

Dr. Palumbo wrote a letter dated September 28, 2009, reporting that plaintiff suffers from PNH and describing the effects of the disease and her treatment. (Tr. 535). He reported that PNH is a disease of the blood marrow which results in the destruction of red blood cells by the

6

immune system, which in turn leads to chronic anemia and a significantly increased risk of thromboses (severe blood clots). He reported that the "chronic anemia caused by the disease often leaves patients fatigued and can result in damage to other organs, particularly the kidneys." (*Id.*). Dr. Palumbo also reported that the blood clots caused by the disease can affect large blood vessels and are often fatal. He reported that he was treating plaintiff with Soliris injections every other week. Dr. Palumbo stated that the Soliris diminished the degree of red blood cell destruction but impaired the function of plaintiff's immune system, leaving her more prone to infections. Dr. Palumbo also reported that the "infusions require her to spend several hours in our clinic for each dose." (*Id.*). Dr. Palumbo stated that because the disease carried a risk of blood-threatening clots and plaintiff had already had one severe blood clot, she was being treated with an anticoagulant, Warfarin. He reported this medication left plaintiff at increased risk for severe bleeding and required frequent monitoring with blood tests every other week to insure that the blood levels of the medicine are as safe and efficacious as possible. Dr. Palumbo also reported that plaintiff's bone marrow function is monitored by regular blood tests performed every other week and that she undergoes bone marrow biopsies once or twice a year. Dr. Palumbo reported that although "the combination of Soliris and Warfarin offer some benefit in the way of decreasing the risk of life-threatening blood clots and at least partially ameliorating the chronic anemia, they are not a cure." (*Id.*).

## 2. Non-examining physicians' reports

In May 2007, state agency physician Dr. Diane Manos, M.D., reviewed plaintiff's medical records and completed a physical residual functional capacity assessment. (Tr. 275-82). Dr. Manos found that plaintiff could occasionally lift/carry 50 pounds; she could frequently

7

lift/carry 25 pounds; she could stand/walk about 6 hours in an 8-hour workday; she could sit about 6 hours in an 8-hour workday; and her ability to push/pull was unlimited. (Tr. 276). Dr. Manos determined plaintiff had no postural, environmental, or other limitations. (Tr. 277-78). Dr. Manos noted that the plaintiff told the emergency room doctor in March 2007 that she had not seen a physician in five years due to insurance problems, but there were primary care notes in the record from March 2006. (Tr. 280). Dr. Manos also noted there was no treating or examining source statement regarding plaintiff's physical capacities in the file. (Tr. 281).

In August 2007, Dr. Maria Congbalay, M.D., completed a physical residual functional capacity assessment. (Tr. 450-57). She found that plaintiff could occasionally lift/carry 20 pounds; she could frequently lift/carry 10 pounds; she could stand/walk about 6 hours in an 8-hour workday; she could sit about 6 hours in an 8-hour workday; her ability to push/pull was unlimited; and she could never climb ladders/ropes/scaffolds. (Tr. 451-52). Dr. Congbalay determined plaintiff had no other limitations.

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation

8

process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

9

2. The claimant has not engaged in substantial gainful activity since February 14, 2000, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: paroxysmal nocturnal hemoglobinuria (PNH) (Exhibit 11F); and as of September 18, 2009, degenerative disc disease (Exhibit 12F/18) (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform light work. She can lift or carry up to 10 pounds frequently and 20 pounds occasionally; she can sit, stand or walk up to 6 hours in an 8-hour workday. The claimant can never climb ladders, ropes or scaffolds, or work around hazardous machinery, or work in an environment with extreme heat/sun. The claimant should not work with the general public to reduce exposure to others who may have colds or flu, and she should not work in jobs that care for sick people such as in a hospital or doctor's office.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born [in] . . . 1987 and was 12 years old on the alleged disability onset date.

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[4]

---

[4] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the unskilled light jobs of cleaner/housekeeper (1,500 local positions and 250,000 national positions) and assembler of small products (6,000 local positions and 675,000 national positions) and the unskilled sedentary jobs of telephone order clerk (500 local positions and 250,000 national positions) and final assembler (1,000 local positions and 157,000 national positions). (Tr. 17).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 14, 2000 through the date of [the ALJ's] decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 11-18).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

### D. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ violated plaintiff's due process rights by relying on an ex parte contact between a Social Security representative and a Children's Hospital staff member to determine the amount of time needed for plaintiff's Soliris infusions, and the ALJ failed to carry her burden at step five of the sequential evaluation process to show the number of jobs plaintiff could perform given the limitation imposed by her need for the bi-weekly injections[5]; (2) the ALJ erred by failing to give sufficient weight to the opinions of plaintiff's treating physicians, Dr. Harris and Dr. Palumbo, by failing to give "good reasons" for discounting Dr. Palumbo's opinion regarding plaintiff's disabling limitations, and by giving the most weight to the non-examining physicians; (3) the ALJ's credibility finding is not supported by the record; and (4) the ALJ erred by relying on answers to improper hypotheticals which she posed to the VE.

### 1. Plaintiff's due process claim is without merit.

Plaintiff' s first assignment of error alleges that the ALJ violated her due process rights by relying on an ex parte contact between a Social Security representative and a Children's Hospital staff member to determine the amount of time required for plaintiff's Soliris infusions. The ALJ's office "contacted the Children's Hospital Hematology Department who reported that treatment takes about 35 minutes and at the most one hour." (Tr. 14). Plaintiff contends that by relying on the ex parte communication with an unidentified individual at Children's Hospital, the ALJ violated the Agency's own procedures set forth in its Hearings, Appeals and Litigation Law

---

[5]The Court will consider the alleged error concerning the ALJ's failure to carry her burden at step five of the sequential evaluation process in conjunction with plaintiff's fourth assignment of error.

12

Manual (HALLEX I-2-7-30, 1993 WL 643048). Plaintiff also argues that the ALJ erred by relying on this information because the other evidence of record shows that the information provided by the staff member was incorrect.

Following the ALJ hearing, the ALJ sent a letter to plaintiff's counsel dated October 29, 2009, informing counsel that she had secured additional evidence which she proposed to enter into the record. (Tr. 103-04). The ALJ enclosed the evidence as Exhibit 21E for counsel's review. (Tr. 105). The evidence is a Report of Contact by Rhonda Vanover of the Cincinnati Hearing Office dated October 29, 2009. (Tr. 105). The Report of Contact states that the Hearing Office contacted the Children's Hospital IV Pharmacy by phone via the Hematology Department and inquired as to the amount of time it takes for a patient to receive an IV Soliris infusion, and the response was that it takes about 35 minutes and at most one hour. (*Id.*). In the letter, the ALJ informed counsel that he had the right to take the following actions in response to the additional evidence: (1) submit written comments concerning the enclosed evidence, a written statement as to the facts and the law he believed applied to the case in light of the evidence, any additional records he wished the ALJ to consider (including a report from the treating physician), and written questions to be sent to the author of the enclosed report; (2) request a supplemental hearing and an opportunity to question witnesses, including the author of the report; and (3) request that the ALJ issue a subpoena to require the attendance of witnesses or the submission of records by means of a subpoena request which counsel was required to submit in writing, no later than 5 days before the date of any supplemental hearing. Counsel was required to include in the subpoena certain information outlined in the ALJ's letter, and the ALJ stated that she would issue a subpoena in response to counsel's request if reasonably necessary for the full presentation of

13

the case. (Tr. 103). The letter stated that if the ALJ did not receive a response within 10 days of the date counsel received the notice, she would assume he did not wish to submit any written statements or records, to request a supplemental hearing, or to orally question the author of the report, in which case the ALJ would enter the enclosed evidence in the record and enter her decision. (Tr. 104).

In response to the ALJ's letter, plaintiff's counsel sent a letter to ALJ Smith dated November 9, 2009. (Tr. 106). Counsel informed ALJ Smith that he had received the letter and the exhibit and had discussed the Soliris injections with plaintiff. Counsel stated as follows:

> I talked with Ms. Payne-Hoppe about this treatment, and she told me that she arrived at 1:00 P.M. for the treatment and did not leave before 4:30 P.M. on this. There is always a time prior to the beginning of the treatment and after the treatment before she can leave. Thus, it takes longer than one hour for her to undergo this required treatment.

*Id.*

In addition to submitting plaintiff's statement, counsel requested the name and title of the individual who was contacted at the Hematology Department and the date and time of the phone call so that he could follow up on the phone call. (*Id.*). The ALJ responded in a letter dated November 10, 2009, that it did not appear the name of the "exact individual" who provided the information was recorded. (Tr. 211). The ALJ informed counsel that if he would like to submit any additional evidence or follow up with the Children's Hospital IV Pharmacy Department, the record would be left open for one week. (*Id.*). Counsel did not thereafter submit any additional information or evidence for the record.

In her decision, ALJ Smith made the following findings regarding plaintiff's Soliris infusions:

With regard to the length of time it takes the claimant to receive her bi-weekly
Soliris infusion, the claimant testified that the infusions "last all day." However,
this office contacted the Children's Hospital Hematology Department who
reported that treatment takes about 35 minutes and at the most one hour. The
Report of Contact correspondence was proffered to counsel to give him the
opportunity to respond with any written statements or records (Exhibit 10B).
However, rather than submitting additional evidence or statements from the
hospital, counsel responded with a statement that the claimant arrived at a
particular appointment at 1:00 p.m. for treatment and did not leave before 4:30
p.m., and further explained that there is always a time prior to the beginning of the
treatment and after the treatment before the claimant can leave (Exhibit 11B). It
does not appear that these infusions last "all day" as alleged by the claimant.
Also, even if working, she could arguably get a job working the night shift or
from 3:00 to 11:00 p.m. and these appointments would not preclude her receiving
these infusions and working.

(Tr. 14).

In *Flatford v. Chater*, 93 F.3d 1296, 1304-05 (6th Cir. 1996), the Sixth Circuit assumed

that an applicant for social security disability benefits has a property interest in those benefits

which is protected by the Fifth Amendment. *See Ferriell v. Commissioner of Social Sec.*, 614

F.3d 611, 620 (6th Cir. 2010) (also citing *Richardson*, 402 U.S. at 401-02) (assuming procedural

due process protections apply to a social security disability claim hearing)). "At a minimum, the

Due Process Clause requires that an individual is afforded notice and an opportunity to be heard

before the deprivation of a protected interest through adjudication." *Id.* (citing *Mullane v. Cent.*

*Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). "In the context of a social security

hearing, due process requires that the proceedings be 'full and fair.'" *Id.* (citing *Flatford*, 93 F.3d

at 1305) (quoting *Perales*, 402 U.S. at 401-02)).

HALLEX I-2-7-30 governs the proffer of posthearing evidence obtained by the ALJ. It

provides that the ALJ must proffer all posthearing evidence unless certain exceptions which are

not applicable here apply. Subsection (B) provides that the proffer letter must:

- Give the claimant a time limit to object to, comment on or refute the evidence, submit a written statement as to the facts and law that the claimant believes apply to the case in light of the evidence submitted, submit written questions to be sent to the author(s) of the proffered evidence or exercise his or her rights with respect to requesting a supplemental hearing and the opportunity to cross-examine the author(s) of any posthearing report(s) if it is determined by the ALJ that such questioning is needed to inquire fully into the issues.

- Advise the claimant that he/she may request a subpoena to require the attendance of witnesses or the submission of records and the procedures for the requesting and issuance of a subpoena.

Subsection (C) provides that if the claimant is represented, the ALJ must send a proffer letter and copy of the new evidence to the representative. A copy of the proffer letter, a copy of the new evidence, and any comments received from the claimant and representative regarding the new evidence must be entered into the record. *Id.* If the claimant requests additional time to submit comments, the ALJ should consider the request under procedures specified in HALLEX I-2-7-20A. I-2-7-30(E). The ALJ must address proffer comments in the rationale of the written decision. I-2-7-30(H). The ALJ must make a formal ruling in the decision or by separate order on any objections to proffered evidence and make the ruling a part of the record. *Id.* If the record must be kept open for the submission of additional evidence, the ALJ should set a time limit for the submission of the evidence. *Id.* If the claimant requests an opportunity to question the author of any posthearing report, "the ALJ must determine if questioning of the author is required to inquire fully into the matters at issue and, if so, whether the questioning should be conducted through live testimony or written interrogatories. . . ." *Id.*

The Court finds that the ALJ did not violate plaintiff's due process rights by relying on the ex parte communication. A review of the record shows that the ALJ complied with HALLEX I-2-7-30 in connection with the proffer of the Report of Contact. The ALJ sent a

16

proffer letter to counsel with the Report of Contact attached; outlined in the letter the action counsel could take in response to the proffer; kept the record open for a specified period of time in order to allow counsel an opportunity to contact Children's Hospital IV Pharmacy Department and submit any additional evidence into the record on plaintiff's behalf; and addressed the comments submitted by counsel in response to the proffer in her decision. (*See* Tr. 14). Plaintiff fails to explain what additional steps the ALJ was required to take pursuant to HALLEX I-2-7-30. Thus, plaintiff's claim that the ALJ violated her due process rights by making an ex parte contact with Children's Hospital Hematology Department and relying on the evidence obtained as a result of that contact is not well-taken.

### 2. The ALJ failed to properly weigh the opinion of treating physician Dr. Harris, but such error is harmless.

Plaintiff claims that the ALJ erred by failing to give "controlling weight" or the "most weight" to plaintiff's treating specialists, Dr. Harris and Dr. Palumbo, as required under Social Security Ruling 96-2p, and by instead giving the most weight to the opinions of the non-examining reviewing physicians in violation of SSR 96-6p. Plaintiff asserts that neither of the non-examining physicians had before them the September 2009 letter from Dr. Palumbo (Tr. 535), and Dr. Congbalay did not see the letter from Dr. Harris as she stated there was no statement from a treating or examining physician regarding plaintiff's physical capacities in the file. (Tr. 456). Plaintiff further alleges that the ALJ erred by failing to give good reasons for discounting the disabling limitations set forth in Dr. Palumbo's letter of September 28, 2009, which plaintiff identifies as the length and frequency of her Soliris injections coupled with fatigue which together prevent her from working 40 hours per week. (Doc. 9 at 7-8, citing SSR 96-8p).

17

The Commissioner argues that "the ALJ's reference to the positive treatment notes and findings throughout the record, along with Plaintiff's substantial daily activities, indicated that the ALJ found that Dr. Harris' opinion was entitled to little weight because it was inconsistent with substantial evidence in the record." (Doc. 10 at 15). The Commissioner argues that the ALJ was not required to evaluate Dr. Palumbo's opinion under the factors set forth in the Agency's regulations because as the ALJ reasonably determined, Dr. Palumbo did not offer a "medical opinion" as defined by the regulations but instead explained in general terms the effects of plaintiff's PNH and treatment. (*Id.*, citing Tr. 16, 535). The Commissioner further argues that the ALJ gave "good reasons" for rejecting Dr. Palumbo's "purported opinion" because in addition to noting that Dr. Palumbo commented only generally on the effects of plaintiff's disorder (Tr. 16), the ALJ received and discussed specific medical evidence that Soliris infusions take only 35 to 60 minutes (Tr. 14), which directly contradicted Dr. Palumbo's letter, and made clear in her opinion for any subsequent reviewer why Dr. Palumbo's opinion was given no weight. (*Id.*, citing 20 C.F.R. § 404.1527(d)(3)-(4); *Wilson*, 378 F.3d at 544).

The treating physician rule mandates that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)). If the ALJ declines to give a treating source's opinion controlling weight, she must then balance the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as

18

a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. §
404.1527(d)(2)).

"Importantly, the Commissioner imposes on its decision makers a clear duty to
'always give good reasons in [the] notice of determination or decision for the weight [given a]
treating source's opinion.'" *Cole*, 661 F.3d at 937 (citing 20 C.F.R. §404.1527(d)(2)). Those
reasons must be "supported by the evidence in the case record, and must be sufficiently specific
to make clear to any subsequent reviewers the weight the adjudicator gave to the treating
source's medical opinion and the reasons for that weight." *Id.* (citing SSR 96-2p). "This
requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Id.*
(citing *Wilson*, 378 F.3d at 544). The requirement also safeguards a reviewing court's time by
permitting meaningful and efficient review of the ALJ's application of the treating physician
rule. *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-45).

Here, both Dr. Harris and Dr. Palumbo are treating sources because both "[have], or
[have] had, an ongoing treatment relationship" with plaintiff. *See id.* (citing 20 C.F.R. §
404.1502). However, only Dr. Harris offered an opinion as to the limitations plaintiff's PNH
imposes on her.[6] The Court finds the ALJ failed to properly apply both the treating physician
rule and the good reasons rule as to Dr. Harris' opinion. The ALJ summarized the limitations
imposed on plaintiff by Dr. Harris in his June 2007 letter as follows:

> A letter in evidence from her treating physician Richard E. Harris, M.D., showed
> that because of her anticoagulation and anemia, he assessed that she should not
> work at any job that required her to stand for long periods of time or that would

---

[6]Dr. Palumbo's report as to the amount of time plaintiff must spend in the clinic for each Soliris infusion
(Tr. 535) is discussed below in connection with plaintiff's fourth assignment of error pertaining to the ALJ's
treatment of the vocational evidence.

> involve continued physical exertion or contact with any machinery which might
> cause bruising or bleeding or physical injury (Exhibit 6F).

(Tr. 15). The ALJ then stated that she gave "some weight to Dr. Harris to the extent it [sic] is

consistent with the residual functional capacity," which the ALJ determined based largely on the

report of the non-examining physician, Dr. Congbalay, with some additional limitations:

> She can lift or carry up to 10 pounds frequently and 20 pounds occasionally; she
> can sit, stand or walk up to 6 hours in an 8-hour workday. The claimant can never
> climb ladders, ropes or scaffolds, or work around hazardous machinery, or work
> in an environment with extreme heat/sun. The claimant should not work with the
> general public to reduce exposure to others who may have colds or flu, and she
> should not work in jobs that care for sick people such as in a hospital or doctor's
> office.

(Tr. 12). Aside from stating that she gave Dr. Harris' opinion "some weight," the ALJ made only

one other mention of Dr. Harris' assessment in her decision:

> In sum, other than Dr. Harris's assessment that the claimant should not work at
> any job that required her to stand for long periods of time or that would involve
> continued physical exertion or contact with any machinery which might cause
> bruising or bleeding or physical injury (Exhibit 6F), no treating physician has
> opined that the claimant could not or should not work.

(Tr. 16).

It is impossible to discern from the ALJ's perfunctory discussion of Dr. Harris' opinion

what evidence the ALJ relied on when deciding not to give controlling weight to Dr. Harris'

opinion concerning plaintiff's limitations. Dr. Harris provided an objectively verifiable basis for

the limitations he imposed- the need for anticoagulation posing increased risk of bruising and

bleeding and anemia resulting from plaintiff's PNH. (Tr. 402). Neither the ALJ nor the

Commissioner has explained how the evidence of record contradicts Dr. Harris' medical opinion

that these conditions resulting from plaintiff's disease preclude work that requires standing for

long periods of time or continued physical exertion.

20

Even assuming Dr. Harris' opinion was not entitled to controlling weight, this does not mean that the ALJ was free to reject the opinion. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). Instead, the ALJ was required to balance the regulatory factors to determine the weight to assign the opinion and to give good reasons for the weight assigned. *Cole*, 661 F.3d at 937. The ALJ failed to consider any of these factors, including "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Id.* (citing *Wilson*, 378 F.3d at 544) (citing 20 C.F.R. § 404.1527(d)(2)). In particular, the ALJ failed to take into account that Dr. Harris is a specialist in the treatment of blood marrow diseases at Children's Hospital; he has treated plaintiff on a regular basis over the course of several years; and he based his opinion on the objectively verifiable conditions resulting from plaintiff's disease.

"The ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Id.* at 939-40 (citing *Blakley*, 581 F.3d at 407). Because the ALJ failed to provide any reasons for her decision to assign only "some weight" to the opinion of Dr. Harris, plaintiff's treating specialist, as to the limitations imposed by her disease, the ALJ's RFC assessment is not supported by substantial evidence.

Nevertheless, a violation of the good reasons rule can be deemed to be "harmless error" if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion. *Id.* at 940. Whether the error was harmless in this case requires further analysis at the fifth stage of the sequential evaluation. At the hearing, the ALJ asked the VE to also consider the

21

limitations imposed by Dr. Harris – that plaintiff could not stand for long periods of time and that she could not perform jobs entailing continued physical exertion or jobs requiring contact with any machinery which might cause bruising, bleeding or physical injury – on plaintiff's ability to perform the sedentary jobs listed by the VE.[7] (Tr. 50). The VE testified that those limitations would not preclude the unskilled sedentary jobs of telephone order clerk (500 local positions and 250,000 national positions) and final assembler (1,000 local positions and 157,000 national positions) he previously identified. The Sixth Circuit has found from 1350 to 2500 to be a significant number of jobs for purposes of Social Security disability claims. *See Nejat v. Commissioner of Social Sec.*, 359 F. App'x 574, 579 (6th Cir. 2009) (citing *Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168, 1174-75 (6th Cir. 1990) (2500 jobs); *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (1350 jobs); *Barker v. Sec'y of Health & Human Servs.*, 882 F.2d 1474, 1478-79 (9th Cir. 1989) (1200 jobs); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 jobs)). Accordingly, any error the ALJ committed in failing to credit Dr. Harris' limitations was harmless and does not require a reversal of this matter.

### 3. The ALJ's credibility finding is supported by substantial evidence.

Plaintiff's third assignment of error asserts that the ALJ's credibility determination is not supported by the record and does not comport with the requirements of 20 C.F.R. § 404.1529 and SSR 96-7p. (Doc. 9 at 8-9). Section 404.1529 and SSR 96-7p describe a two-part process for assessing the credibility of an individual's statements about symptoms, including pain. First, the ALJ must determine whether a claimant has a medically determinable physical or mental

---

[7]Dr. Harris' limitation of no prolonged standing would eliminate the light jobs identified by the VE because light work by definition requires "a good deal of walking or standing." *See* 20 C.F.R. §§ 404.1567(b); 416.967(b).

impairment that can reasonably be expected to produce the symptoms alleged; second, the ALJ

must evaluate the intensity, persistence, and functional limitations of those symptoms by

considering objective medical evidence and other evidence, including: (1) daily activities; (2) the

location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and

aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken

to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of

pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other

factors concerning functional limitations and restrictions due to pain or other symptoms. 20

C.F.R. § 404.1529(c); SSR 96-7p. "[A]n ALJ's findings based on the credibility of the applicant

are to be accorded great weight and deference, particularly since an ALJ is charged with the duty

of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a

claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r of Soc.*

*Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citations omitted).

Here, the ALJ determined that plaintiff's statements about her limitations were not

entirely credible. (Tr. 13). The ALJ found that plaintiff's daily marijuana use despite her doctors

warnings of increased blood clots suggests noncompliance with health precautions. The ALJ

also noted that plaintiff's reported activities suggest a far greater activity level than alleged at the

hearing and are not indicative of extreme fatigue. Additionally, the ALJ noted that despite

plaintiff's complaints of a significantly decreased immune system and susceptibility to numerous

infections which lead her to avoid others, she smokes marijuana with friends, goes grocery

shopping, attends yearly events which attract large crowds, and goes to the movies. The ALJ

also found that the post-hearing evidence she obtained appeared to conflict with plaintiff's

purported testimony that her Soliris infusions "last all day." Lastly, the ALJ determined that plaintiff's complaints of fatigue are not supported by treatment notes from Children's Hospital, which show she is doing well with no complications from her PNH impairment and that her energy level is good. (Tr. 13-14).

Plaintiff argues that the fact her doctors encouraged her to exercise does not show an ability to work 40 hours per week; her credibility is aided by the fact she tried to work part-time but missed too much work (Doc. 9 at 9, citing Tr. 402-03); she takes breaks from the daily activities of doing dishes (*Id.*, citing Tr. 45) and is fatigued; her best position is sitting crosslegged on the couch (*Id.*), which she cannot do while working at the unskilled jobs the VE listed; she must be careful being around others due to her impairments (*Id.*, citing Tr. 54); and she takes strong medications for her illness. Plaintiff contends that the ALJ erred by discounting her credibility on the basis of her admitted daily marijuana use because the ALJ failed to note that plaintiff was allegedly "prescribed this medical marijuana in California" as evidenced by the fact California has a medical marijuana statute (*Id.* at 9, 16-17, citing Tr. 34); the marijuana helps plaintiff's pain and symptoms (*Id.*, citing Tr. 33); and plaintiff's marijuana usage is not material to the disability determination under 20 C.F.R. § 404.1535 because it does not increase the severity of her impairments.

The ALJ's credibility finding is supported by substantial evidence. Despite plaintiff's complaints of debilitating fatigue, the medical records reflect that after Soliris injections were started, plaintiff consistently had no complaints of fatigue on her regular medical visits, she was doing well, and her energy level was good. (*See supra*, pp. 4-6). Furthermore, the ALJ was entitled to rely on plaintiff's reported daily activities to discount her testimony regarding the

24

disabling effects of her impairments. Plaintiff testified at the ALJ hearing that any activity such as doing the dishes makes her tired (Tr. 44-45), but the medical records show that she engages in exercise such as yoga and strength training (Tr. 996) and her energy level was generally reported to be good. In addition, although plaintiff suggests that she cannot perform the unskilled jobs the VE listed because she must sit cross-legged due to her back impairment (Doc. 9 at 9, citing Tr. 45), medical records indicate that her back pain was well-controlled. (*See* Tr. 716- 4/08- back pain overall improved, pain responding to occasional dose of Celebrex, and narcotics had not been required for back pain for several months; Tr. 925- 9/08- back pain "really improved" and no medication required; Tr. 997- 12/08- mild back pain (rated by plaintiff as "2" on a "1-10" pain scale") which plaintiff attributed to cold weather; Tr. 1007- 1/09- back problem well-controlled by Celebrex and physical therapy).

Furthermore, the ALJ was entitled to discount plaintiff's testimony as to the severity of her symptoms based on plaintiff's failure to follow her doctor's medical advice to not smoke marijuana because it increased her risk of blood clots. Although plaintiff claims in the Statement of Errors that she was prescribed medical marijuana in California (Doc. 9 at 9, citing Tr. 34), plaintiff did not testify to this at the ALJ hearing. Moreover, the mere existence of a medical marijuana statute in the State where plaintiff used to live fails to establish that plaintiff was prescribed medical marijuana while residing there. (*See* Doc. 9 at 9). In addition, although plaintiff testified that she smoked marijuana because it helped with her "comfort and [her] pain " (Tr. 33), the medical records are consistently devoid of complaints that plaintiff experiences significant discomfort or pain. Thus, plaintiff's admitted failure to follow her doctor's advice to avoid smoking marijuana supports the ALJ's credibility determination.

25

Finally, the ALJ could reasonably discount plaintiff's credibility based on her testimony that she could not take the bus because she could not risk being around a lot of people. (Tr. 34). Plaintiff's testimony that she occasionally goes to the movies and yearly events in town (Tr. 41) appears to contradict her testimony that she could not be around groups of people. Moreover, there is no indication in the medical evidence that plaintiff was advised to avoid contact with the public generally, and clinic notes show that she was not discouraged from pursuing a volunteer job at the zoo in January of 2009. (Tr. 997).

The ALJ cited ample reasons for discounting plaintiff's credibility. Because the ALJ's credibility determination is supported by substantial evidence, this Court must defer to it. *See Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001). Plaintiff's third assignment of error should be overruled.

### 4. Plaintiff's claim that the ALJ's decision at step five of the sequential evaluation is not supported by substantial evidence should be sustained.

The ALJ determined that jobs exist in significant numbers in the national economy that plaintiff can perform. (Tr. 17). In making this determination, the ALJ relied on the VE's testimony to find that plaintiff would be able to perform the unskilled light jobs of cleaner/housekeeper (1,500 local positions and 250,000 national positions) and assembler of small products (6,000 local positions and 675,000 national positions) and the unskilled sedentary jobs of telephone order clerk (500 local positions and 250,000 national positions) and final assembler (1,000 local positions and 157,000 national positions).

Plaintiff contends that the ALJ erred at step five of the sequential evaluation process by (1) relying on answers to improper hypotheticals to the VE that failed to take into account plaintiff's need to take leave for Soliris injections, her need for unscheduled breaks, and the

26

limitations imposed by the easy bruising associated with Coumadin, especially as to the jobs of cleaner, housekeeper, and assembler; and (2) relying on the Dictionary of Occupational Titles (DOT) rather than consulting a more updated publication regarding the order clerk job. (Doc. 9 at 10, citing *Cunningham v. Commissioner*, 360 F. App'x 606, 615-16 (6th Cir. 2010)).

First, plaintiff has not shown that the ALJ erred by relying on the DOT for the order clerk job. Plaintiff simply alleges that the ALJ failed to note that the DOT was last updated "years ago." (Doc. 9 at 10). Plaintiff has not produced any evidence to show that the order clerk job description in the DOT is obsolete so as to render the VE's testimony on this matter unreliable. *See Cunningham*, 360 F. App'x at 615 ("While the Social Security Commissioner does take administrative notice of this document when determining if jobs exist in the national economy, 20 C.F.R. § 404.1566(d)(1), common sense dictates that when such descriptions appear obsolete, a more recent source of information should be consulted."). Thus, plaintiff's claimed error with respect to the ALJ's reliance on the DOT is not well-taken.

Second, plaintiff has not shown that the ALJ erred by failing to include the need for unscheduled breaks in the hypothetical posed to the VE. There is no medical evidence in the record to support this limitation. The VE testified that plaintiff's testimony that she sometimes needs to sleep even if she does not want to could preclude her from working.[8] (Tr. 51-52). However, no physician reported that plaintiff needed to nap during the day. In addition, for the reasons stated above, the ALJ's determination that plaintiff's testimony concerning her fatigue was not credible and was not supported by the medical evidence finds substantial support in the

---

[8]When asked during her testimony if she takes any naps during the day, plaintiff responded "Yes, occasionally I do. I do not like to take naps but I have to." (Tr. 45).

record. Thus, the ALJ did not err by omitting a need for extra breaks from the hypotheticals she posed to the VE.

Third, any failure on the part of the ALJ to consider the limitations imposed by the easy bruising associated with Coumadin therapy, especially as to the jobs of cleaner, housekeeper, and assembler, was harmless. As discussed above, even assuming the light jobs identified by the VE are eliminated by Dr. Harris' limitations (including no jobs requiring contact with any machinery which might cause bruising or bleeding or physical injury), the VE testified that the sedentary jobs would not be eliminated. (Tr. 50). The remaining sedentary jobs identified by the VE constitute a substantial number of jobs and would satisfy the Commissioner's burden of proof at step five of the sequential evaluation process.

However, the Court agrees with plaintiff that the ALJ erred at step five of the sequential evaluation process by failing to fully account for the limitations imposed by plaintiff's need to take leave from work for biweekly Soliris infusions. (Doc. 9 at 5, 7). To show that the ALJ erred in this regard, plaintiff relies on (1) her statement which counsel provided to the ALJ post-hearing that she must stay in the clinic for a period of time before and after each treatment and she arrives at 1:00 p.m. for a treatment and does not leave before 4:30 p.m. (Tr. 106) and (2) Dr. Palumbo's letter dated September 28, 2009. (Tr. 535). Dr. Palumbo's letter states that he treats plaintiff with a combination of Soliris and Warfarin and that she receives Soliris infusions in the Children's Hospital clinic every other week. Dr. Palumbo also states: "The infusions require her to spend *several hours* in our clinic for each dose." (*Id.*) (emphasis added).

The Commissioner argues that the ALJ considered the possibility that plaintiff would miss substantial amounts of work when receiving her Soliris infusions but reasonably determined

28

that her infusions do not cause work-related limitations. (Doc. 10 at 12). The Commissioner contends that the ALJ discounted plaintiff's testimony that the infusions take most of the day after seeking out additional evidence on the extent of the limitation, if any, of the infusions on her ability to work (Tr. 14); the ALJ found that plaintiff could arguably get a job working second or third shift; and even though the VE did not specify how many of the over one million jobs he determined plaintiff could perform were second or third shift work, it is safe to assume it is a significant number. (*Id*. at 13-14). In any event, the Commissioner states that the real issue is not the number of second or third shift jobs available because the ALJ determined that plaintiff's infusions took much less time than the several hours alleged. (*Id*. at 14).

In her decision, the ALJ determined that "[i]t does not appear that [the Soliris] infusions last 'all day' as alleged by [plaintiff]." (Tr. 14). In discounting plaintiff's testimony, the ALJ relied on (1) the Report of Contact containing information from the Children's Hospital IV Pharmacy that the treatment itself takes about 35 minutes and at most one hour (Tr. 105); and (2) plaintiff's statement in response to the proffer of the Report of Contact that she arrives for treatment at 1:00 p.m. and does not leave before 4:30 p.m. and explaining she must be at the clinic for a period of time before treatment starts and after treatment ends. (Tr. 106). The ALJ concluded that "even if working, she could arguably get a job working the night shift or from 3:00 to 11:00 p.m. and these appointments would not preclude her from receiving these infusions and working." (Tr. 14).

In determining the amount of time plaintiff's Soliris infusions require, the ALJ misconstrued plaintiff's testimony. Plaintiff did not testify that the Soliris infusions "last 'all day'" as the ALJ stated in her decision. (Tr. 14). Rather, plaintiff confirmed in response to

questioning by the ALJ that the Soliris infusions take a few hours, while adding, "I'm particularly there most of the day." (Tr. 37). Plaintiff clarified in her response to the proffer of evidence by the ALJ that she is at her appointments from 1:00 p.m. to 4:30 p.m. (Tr. 106). The ALJ did not explain why she rejected plaintiff's specific statement submitted in response to the proffer of the Report of Contact.

Moreover, the ALJ ignored Dr. Palumbo's report that plaintiff must spend "several hours" in the clinic for each dose of Soliris.[9] This report is consistent with plaintiff's clarified response that her clinic appointments last from 1:00 p.m. to 4:30 p.m., which includes the time she must spend at the clinic before and after each injection. Yet, the ALJ failed to make any finding as to how long plaintiff actually spends in the clinic for each dose of Soliris, or whether Dr. Palumbo's report was consistent with the information obtained from the Children's Hospital IV Pharmacy. (Tr. 105). Thus, the Court is unable to discern if the ALJ overlooked Dr. Palumbo's report as to the amount of time plaintiff must spend in the clinic or simply ignored it in assessing the limitations imposed by plaintiff's impairments. As plaintiff's treating specialist who administered the biweekly treatments, Dr. Palumbo's statement regarding the amount of time required for plaintiff's treatments should have been considered by the ALJ. The ALJ failed to provide any reason to discount the information provided by Dr. Palumbo regarding plaintiff's treatment.

The ALJ's failure to consider Dr. Palumbo's report that plaintiff's treatment takes several hours does not constitute harmless error. As indicated, Dr. Palumbo's report is consistent with

_____

[9]The ALJ mentioned Dr. Palumbo's report elsewhere in her decision (Tr. 16), but did not mention this portion of the letter. (Tr. 16, citing Tr. 535).

30

plaintiff's evidence that she needs to be at the clinic from 1:00 p.m. to 4:30 p.m. every two weeks for Soliris injections. The VE testified that plaintiff's unscheduled absences could not exceed one to one and one half days per month if plaintiff were to engage in competitive employment.[10] (Tr. 50). Yet, the ALJ never inquired whether a "scheduled" absence of the same length would preclude competitive employment, or whether employers of the unskilled, sedentary jobs listed by the VE would tolerate the number of absences plaintiff would experience due to her regularly scheduled Soliris infusion treatments.[11]

In any event, the VE's subsequent testimony strongly implies that plaintiff's ability to engage in competitive employment depends on a work schedule that does not overlap her medical appointments. At the ALJ hearing, the following colloquy took place between the ALJ and the VE regarding the need for scheduled time off in response to the ALJ's question as to whether there was anything in Dr. Palumbo's September 29, 2009 letter "that's preclusive of work or limits the work environment per se" in a way the ALJ had not yet accounted for in her questioning:

A.    I mean, he doesn't, he really describes her disease. I mean, certainly he mentions that she requires infusions which require that she be in the clinic for, *he says several hours, which would be something that would, you know, typically be, need to be scheduled around at work*. That would be - -

Q.    So if she worked at night or that per se it would not interfere?

A.    If she could *find work that didn't, where the schedule didn't overlap with that*, yes. I mean, I would assume they are going to want to do that pretty much between 8:00, or 7:00 and, you know, 4:00 in the afternoon on a weekday. They're not going to come in on Saturdays and Sundays to do that kind of thing.

---

[10]The ALJ asked the VE, "And just as a general matter, the number of days she can miss in a month and still do competitive employment?" The VE answered, "In general I would say no more than a day to a day and a half of unscheduled absence." (Tr. 50).

[11]If plaintiff's biweekly medical appointments last three and one-half hours each, she would arguably meet the minimum threshold.

31

(Tr. 51) (emphasis added).

It appears from the VE's testimony that plaintiff would be able to perform the jobs the VE identified only if her work schedule did not overlap with her scheduled medical appointments. The ALJ nonetheless interprets this testimony to mean that plaintiff would be precluded from performing only day shift jobs, because plaintiff "could arguably get a job working the night shift or from 3:00 to 11:00 p.m. and these appointments would not preclude her receiving these infusions and working." (Tr. 14).

The ALJ's finding in this regard is not substantially supported by the record evidence. Whether plaintiff could work a second shift job, from 3:00 p.m. to 11:00 p.m., depends on the amount of time required for her infusion treatments. The ALJ's finding is premised on the Report of Contact information from an unidentified Children's Hospital employee and, as explained above, does not account for Dr. Palumbo's report or plaintiff's evidence showing her biweekly treatments require her to be at the clinic for "several hours" from 1:00 p.m. to 4:30 p.m. Therefore, the ALJ was not entitled to rely on the VE's testimony to find that plaintiff could work a 3:00 p.m. to 11:00 p.m. shift.

The ALJ also found that plaintiff could "arguably" get a job working the night shift without interruption from her scheduled treatments. (Tr. 14). The question then becomes whether the record provides substantial support for a finding that even with the elimination of the first and second shift jobs, there is a significant number of jobs in the national economy that plaintiff is capable of performing given the limitations imposed by her impairments. There is no evidence in the record as to the number of night shift jobs available for the positions listed by the VE.

32

The Commissioner contends it can be safely assumed that of the approximately one million unskilled light and sedentary jobs plaintiff could perform, there is a significant number of jobs in the national economy plaintiff could perform if able to work only the second and third shifts. Yet, as explained above, Dr. Harris' limitations would preclude the light jobs identified by the VE, leaving only the sedentary positions listed by the VE, *i.e.,* 500 order clerk positions in the local economy and 250,000 positions in the national economy and 1,000 unskilled assembly positions in the regional economy and 157,000 positions in the national economy. (Tr. 49-50). There is no evidence in the record to support a finding that of these sedentary positions, a significant number exist on the night shift.[12] Nor can the Court "assume" that a significant number of such jobs exist as the Commissioner argues. This Court's duty on judicial review is not to assume facts not in evidence, but to determine whether substantial evidence already in the record exists to support the Commissioner's determination. As there is no such evidence on the number of night shift positions in this case, the ALJ's decision is not supported by substantial evidence.

This matter should be reversed and remanded for further proceedings. The critical issues in this case are the particular schedule and amount of time required for plaintiff's Soliris

---

[12]The Court notes that in determining the availability of jobs for purposes of Social Security disability, an ALJ may not consider whether individual employers would accommodate plaintiff's need for time off to attend her treatments under the Americans With Disabilities Act. *See Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 95 (3d Cir. 2007); *Jones v. Apfel,* 174 F.3d 692, 693 (5th Cir. 1999); *Eback v. Chater,* 94 F.3d 410, 412 (8th Cir. 1996). *Cf. Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 803 (1999) ("[W]hen the SSA determines whether an individual is disabled for SSDI purposes, it does *not* take the possibility of 'reasonable accommodation" into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI."); *Griffith v. Wal-Mart Stores, Inc.,* 135 F.3d 376, 380 (6th Cir. 1998) ("[T]he Social Security Administration does not consider whether an individual is able to work with reasonable accommodation in determining entitlement to disability benefits.").

33

treatments and the impact on plaintiff's ability to perform substantial gainful activity. On remand, the ALJ should obtain clarification from plaintiff's treating sources on plaintiff's Soliris treatment schedule and the length of time she must remain at the clinic for each treatment, and vocational testimony on the impact of such scheduled treatments on plaintiff's ability to perform work activity.

## IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: 2/7/2012

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MAKENA PAYNE-HOPPE,
    Plaintiff

      vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-0097
Beckwith, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).